IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN MESKAUSKAS, R44760, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Case No. 15 C 2580 |
| | ) | |
| RANDY PFISTER, Warden, | ) | Judge Joan H. Lefkow |
| Pontiac Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

Jonathan Meskauskas, currently in the custody of Randy Pfister, Warden of Pontiac Correctional Center in Pontiac, Illinois, is serving a sixty-year sentence for first-degree murder, a consecutive forty-year sentence for home invasion, and a concurrent ten-year sentence for the aggravated discharge of a firearm. He has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons stated below, his petition is denied.

**BACKGROUND**[1]

**I.     Factual Background**

Meskauskas was found guilty following a bench trial in the Circuit Court of Cook County. The evidence presented at trial is summarized as follows: On January 4, 2003, Meskauskas and his then-girlfriend Dawn Booth attended a party at Roy Radzus's apartment. Also at the party were Radzus's roommates—David Howe, Ronald Radovick, and Jack

---

[1] The facts in this section are derived from the Illinois Appellate Court's opinion, *People* v. *Meskauskas*, 2014 WL 2727220 (Ill. App. Ct. June 13, 2014). On habeas review, "state court factual findings that are reasonably based on the record are presumed correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence." *Kaczmarek* v. *Rednour*, 627 F.3d 586, 589 (7th Cir. 2010) (citations omitted); *see also* 28 U.S.C. § 2254(e)(1). Meskauskas has not attempted to rebut the state courts' recitation of the facts and they are accepted as correct.

1

Senodenos—and Byron Bauer, Meskauskas's friend. Meskauskas and Radzus were friends and formerly affiliated with the Ambrose gang; Radovick was a member of the Latin Kings gang. The attendees were drinking beer, listening to music, and playing cards. Tensions arose between Meskauskas and Radovick and, after not complying with the host's direction to leave, Bauer escorted Meskauskas and Booth out of the apartment. Radovick left through the back door and assaulted Meskauskas outdoors. The two were separated, police arrived, and Meskauskas, Booth, and Bauer left. (Dkt 10-1 ¶¶ 5-9)

Upon arriving at their own apartment, Meskauskas and Booth argued. Meskauskas then took the car and left. Booth and Bauer picked up James Kall and returned to the party. Meskauskas returned to his apartment after approximately thirty minutes and found no one there. He believed that Booth had returned to the party and worried she would be harmed by Howe or Radovick.[2] Meskauskas armed himself with a loaded gun and returned to Radzus's apartment. Meskauskas claimed that he returned to the party with the sole intention of getting Booth. The gun, he asserted, was for protection so that if someone tried to attack him, "he could pull [his] shirt up, show them the gun, and they'd just leave [him] alone." (*Id,* ¶¶ 9, 19)

There was conflicting testimony about what happened next. Meskauskas testified that he knocked on Radzus's door and requested that the door be opened. Bauer and Kall opened the door and Meskauskas inquired about Booth. Meskauskas entered the apartment and, as he walked towards Booth, he heard Radovick yell "King love, motherf***!" (gang slur). Meskauskas saw Radovick holding a butcher's knife walking towards him. Meskauskas pulled out his gun and fired at Radovick. Meskauskas followed Radovick and Senodenos as they fled.

---

[2] Meskauskas testified that Howe "had just threatened [Booth's] life and he knew that [Radovick] had killed a girl before." (Dkt. 10-1 ¶ 19.) Meskauskas, Booth, and defense witness Faith Neswick testified that before Meskauskas left the party, Howe threatened to "have 50 mother*** Kings at [his] door with a nine to kill [Meskauskas and his] lady." (*Id.* ¶ 18.) Howe denied making any threat.

2

Radovick and Senodenos stopped after running a few feet and turned as if to come at Meskauskas. Each time, Meskauskas fired at them to keep them away. Meskauskas feared that if he turned to leave then Radovick would stab him. (*Id.,* ¶¶ 19-21)

Howe testified that there was a sound of someone kicking Radzus's door. Bauer went to the door (*id.*) and looked out of the peephole (*id.* at n.1) Bauer stated, "[H]e has a gun." Despite Bauer's trying to hold the door closed, it flew open. Howe saw Meskauskas standing in the open doorway holding a gun. Meskauskas entered the apartment and Howe fled upstairs. Howe heard gun shots as he fled. (*Id.,* ¶ 11)

Radzus testified that there was a pounding at his door. Meskauskas kicked the door open and entered the apartment.[3] Radzus did not see Radovick holding a knife. After entering the apartment, Meskauskas chased Radovick and Senodenos. Radzus ran upstairs and heard one gunshot during the incident (*Id.* ¶ 10.)

Senodenos testified to hearing a loud banging or kicking on Radzus's door. As Kall and Bauer went to the door, Radovick armed himself with a kitchen knife. Bauer opened the door a few inches to talk with Meskauskas. Meskauskas pushed through the partially open door. Senodenos and Radovick turned and fled towards another door. As he opened the door, Senodenos saw a flash and heard a loud bang. Radovick said he was shot. Senodenos and Radovick fled outside the apartment and Meskauskas chased them around the apartment complex one-and-a-half times. Throughout his pursuit, Meskauskas was never closer than ten to fifteen feet from Senodenos and Radovick. (*Id.*, ¶¶ 14-15)

The trial court found that Meskauskas forced his way into Radzus's apartment, and, once inside, brandished the gun. Radovick and Senodenos ran and Meskauskas fired a shot, which hit Radovick. Meskauskas chased Radovick and Senodenos around the apartment complex,

---

[3] Booth also testified that Meskauskas kicked Radzus's door open. (*See* dkt. 10-1 ¶ 12.)

repeatedly firing the gun at them. The trial court found incredible Meskauskas' testimony that he repeatedly shot Radovick because he feared Radovick would stab him, considering that Meskauskas chased Radovick around the apartment building one-and-a-half times while repeatedly shooting Radovick in the back. Ultimately, Radovick died from multiple gunshot wounds to the back of his shoulder, left arm, and right leg. (Dkt. 10-6 at 185-186)

## II.     Procedural History

Meskauskas appealed his conviction and sentence. On November 17, 2006, the Illinois Appellate Court affirmed. The Illinois Supreme Court denied Meskauskas's petition for leave to appeal (PLA) on May 31, 2007. On February 14, 2008, Meskauskas filed a *pro se* petition under the Illinois Post-Conviction Hearing Act, 725 Ill. Comp. Stat. 5/122-1 *et seq.*, claiming, among other things, (1) that his trial counsel was ineffective for failing to interview and call Bauer and Kall to testify and (2) that the State withheld potentially exculpatory evidence during the trial. (Dkt. 10-16 at 170–80.)

To his second supplemental petition, Meskauskas attached signed affidavits from Bauer and Kall in which they recounted their versions of the events.[4] Kall attested that before Meskauskas arrived, Radovick told him that if Meskauskas came back to the apartment he would regret it, meaning that the police would not be able to save him next time. A few minutes later, he heard pounding on Radzus's door so he and Bauer went to the door. Kall opened the door "further" and Meskauskas walked past him towards Booth. (*Id.*) Kall did not see a gun in Meskauskas's hand but heard Radovick yell the gang slur. (*Id.*) In response to the gang slur, Meskauskas pulled a gun from his waistline. (*Id.*) Upon hearing the gun fire, Kall fell to the floor

---

[4] According to the appellate court, Bauer and Kall both gave statements to the police. Kall averred that he was not released until he signed a statement the police read to him even though he had told them what he later stated in the affidavit. Bauer averred that the police threatened to charge him as an accomplice unless he went along with what they wanted him to say. (Dkt. 10-1 ¶¶ 27–30.) Neither statement to the police has been made part of the record.

4

to cover himself. (*Id.* at 178)

Bauer attested that he heard repeated banging on Radzus's door so he and Kall went to the door. Kall opened the door for Meskauskas to enter the apartment. As Meskauskas entered, Bauer heard Radovick yell the gang slur. Radovick had a knife and approached Meskauskas. In response, Meskauskas pulled a gun from under his coat and, upon seeing the gun, Bauer fell to the floor and covered himself. Bauer claimed that his statement to the police was untrue in that "[Meskauskas] did not bust in the entry door to the apartment when he returned to the party. Nor did he have a gun in his hand when he entered the apartment." He further stated that, prior to testifying, he told the Assistant State's Attorney the true version of "what happened at the party." In response, the Assistant State's Attorney indicated that Bauer probably would not testify, and he did not testify. (*Id.* at 177-178)

On May 4, 2012, without holding an evidentiary hearing, the Circuit Court denied Meskauskas's post-conviction petition. (Dkt. 10-1 ¶¶ 31–33.) The Illinois Appellate Court affirmed. (Dkt 10-1; *People* v. *Meskauskas*, No. 1-12-1328, 2014 WL 2727220, at *45 (Ill. App. Ct. June 13, 2014).) Meskauskas's PLA in the Illinois Supreme Court was denied on September 24, 2014. (Dkt. 10-23.) On March 11, 2015, Meskauskas timely filed a *pro se* 28 U.S.C. § 2254 petition for writ of habeas corpus in this court, *see* 28 U.S.C. § 2244(d)(1)(A), presenting the two arguments he had made in his state post-conviction petition.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act (AEDPA) permits a federal court to grant a petition for writ of habeas corpus for any claim adjudicated on the merits in state court if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2). A state court's decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court]," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Bell* v. *Cone*, 543 U.S. 447, 452–53, 125 S. Ct. 847, 160 L. Ed. 2d 881 (2005) (quoting *Williams* v. *Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 3d 389 (2000)). For purposes of habeas relief, a state court's decision is considered reasonable so long as "fairminded jurists could disagree" on the outcome. *Yarborough* v. *Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004); *see also Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002) ("A state court decision must be more than incorrect from the point of view of the federal court . . . which means something like lying well outside the boundaries of permissible differences of opinion."); *Schultz* v. *Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is 'minimally consistent with the facts and circumstances of the case.'" (quoting *Schaff* v. *Snyder*, 190 F.3d 513, 523 (7th Cir. 1999))).

**ANALYSIS**

Meskauskas raises two claims: (1) ineffective assistance of trial counsel and (2) a *Brady* violation.

**I.   Ineffective Assistance of Counsel**

Meskauskas contends that counsel's failure to investigate and call Bauer and Kall to testify constituted ineffective assistance, in violation of his right to due process of law. (Dkt. 1 at 5.) He argues that, if counsel had called Bauer and Kall as witnesses, their testimony would have demonstrated that he was guilty of second-degree rather than first-degree murder and that he was not guilty of home invasion. (*Id.* at 23; *see* dkt. 10-1 ¶ 38 ("[Meskauskas] argues [Kall and Bauer's testimony] would have supported his claim that he was allowed to enter the apartment and was therefore not guilty of home invasion, and that he was guilty of second-degree murder because he drew his gun after the victim raised a knife at him and shouted a Latin Kings battle cry").)

For claims of ineffective assistance of counsel, *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), governs whether counsel's performance is constitutionally effective. *See Harrington* v. *Richter*, 562 U.S. 86, 92, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). *Strickland* dictates that a court must consider (1) whether counsel's representation fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. This standard is viewed through the lens of § 2254(d)(1)'s "contrary to" or "unreasonable application of" provisions: "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. A habeas petitioner "must do more than show he would have satisfied *Strickland*'s test if his

7

claim were being analyzed in the first instance. . . . [H]e must show that the [Illinois Appellate Court][5] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Emerson* v. *Shaw*, 575 F.3d 680, 685 (7th Cir. 2009) (alterations in original) (quoting *Bell* v. *Cone*, 535 U.S. 685, 698–99, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)).

The Warden argues there was no reasonable probability that Bauer's or Kall's testimony would have undermined the trial court's guilty verdict. (Dkt. 9 at 19.) The Illinois Appellate Court concluded that Meskauskas had not established that counsel's assistance was deficient where the potential witness (Bauer) had given contradictory statements that would have subjected him to impeachment by the State, such that there was no reasonable probability that the failure to call witnesses affected the outcome of the proceeding.[6] (Dkt. 10-1 ¶¶ 49, 56–57.)

The Illinois Appellate Court thoroughly reviewed the evidence in light of the affidavits of Bauer and Kall, pointing out that they had given contradictory statements to the police and were friends of Meskauskas, which would have subjected them to damaging impeachment. Such impeachment would have reduced the value of the testimony such that the court could not conclude that failure to investigate further or call them as witnesses was objectively unreasonable. (*Id.* ¶ 43.) The court also noted that both Kall and Bauer had given inconsistent statements even during post-conviction proceedings as to who opened the door for Meskauskas. (*Id.* ¶ 46.) Since both the State and defense counsel had identified them as witnesses, the defense had requested and received police reports and interviewed other witnesses in preparation for trial,

---

[5] A federal court typically considers "'the last reasoned opinion on the claim'—here the opinion of the Illinois Appellate Court." *Wooley* v. *Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (quoting *Yist* v. *Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed 2d 706 (1991)).

[6] Further, the Illinois Appellate Court noted that it was reasonable for counsel to forgo the presentation of Bauer's and Kall's testimony. The court stated, "Considering the contradictory statements Kall and Bauer gave the police after the shooting, it was reasonable for trial counsel to conclude that they would not have provided favorable testimony for defendant at the time of his trial." (Dkt. 10-1 ¶ 45.)

and both Kall and Bauer were available at trial, the court inferred that "at least to some extent, [] counsel had investigated such avenues of testimonial evidence, and ultimately decided against it." (*Id.* ¶ 47.)

Ultimately, the court held "that, regardless of whether counsel's performance was deficient, defendant ha[d] failed to establish a reasonable probability that he would have been convicted of second-degree murder and acquitted of home invasion, had Bauer and Kall testified." (*Id.* ¶ 49.) Concerning Meskauskas's second-degree murder theory, the court pointed out that Kall's affidavit did not include anything about the victim's having possessed a knife, so his testimony would not have supported defendant's testimony or theory of defense.[7] (*Id.*) Further, it stated,

> [B]y all accounts, the undisputed evidence indicated that defendant shot at the victim and Senodenos as they attempted to run away from him, defendant pursued them, and he shot the victim three times from behind. Defendant continued to pursue them and shoot at them, and chased them outside and around the apartment building. Defendant also threatened Senodenos after the victim went inside. Despite his claim of fearing for his life, defendant had sufficient criminal intent to demand, immediately after the shooting, that Senodenos tell the police that he saw nothing, while pointing the gun at his face.

(*Id.*) With respect to the home invasion conviction,[8] the court reasoned, "[R]egardless of Kall's and Bauer's proposed testimony that Kall opened the door for defendant, the evidence nevertheless showed that defendant had bad intent when he entered."[9] (*Id.* ¶ 50.)

---

[7] **Error! Main Document Only.**The court recited the elements of second-degree murder as requiring the jury to find that "at the time of the killing [the defendant] believes the circumstances to be such that, if they exist, would justify the use of deadly force under the principles of self-defense, but his belief is unreasonable." (Dkt. 10-1 ¶ 42 (citations and internal quotation marks omitted).)

[8] "[A] person is guilty of home invasion "when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and he or she '[i]ntentionally causes any injury to any person or persons within such dwelling place." (Dkt. 10-1 ¶ 43 (citations and internal quotation marks omitted).)

> It is undisputed that, at the party, defendant was affronted by insults to his gang, which he testified that he took personally. He was essentially forced to leave the apartment and beaten up by the victim. As stated, he then chose to arm himself with a loaded gun and return to the apartment. The proposed testimony of Kall and Bauer would not have contradicted the other testimony establishing that defendant repeatedly banged, pounded, or kicked the door, aggressively, which all trial witnesses testified to. In fact, their affidavits corroborated that he repeatedly pounded or banged on the door. Neither Kall nor Bauer testified that anyone actually invited defendant inside. Further, according to testimony, defendant produced the gun and started shooting within moments of crossing the threshold into the apartment. Thus, even assuming the door was opened for him, defendant was not authorized to enter the apartment, as he did not have an innocent intent when he returned, and Kall and Bauer's affidavits fail to refute that evidence.

(*Id.* ¶¶ 49–51.)

Meskauskas takes issue with the Warden's reliance on *Garrett* v. *Acevedo*, 608 F. Supp. 2d 1005, 1014 (N.D. Ill. 2009), where counsel had failed to call two eyewitnesses who, the petitioner believed, would have supported his self-defense theory. *Id.* at 1013. The court rejected the ineffective assistance claim, finding that, although the proposed testimony would have corroborated portions of the defendant's testimony, it would have also supported the State's theory that the defendant shot the victim with the intent to kill. *Id.* at 1014.[10] The court explained that neither witness would have contradicted testimony that the defendant shot the victim a second time as he fled nor testimony regarding the victim's injuries. *Id.* Meskauskas argues that (a) *Garrett* was a jury trial, unlike here where the trial judge explained his reasons for the verdict; (b) in *Garrett*, the court held an evidentiary hearing where his attorney explained his decision not to call the witnesses; and (c) there were significant factual differences between the

---

[9] The court cited *People* v. *Bush*, 157 Ill. 2d 248, 253–54, 623 N.E.2d 1361 (1993), which states, "[T]he determination of whether an entry is unauthorized depends upon whether the defendant possessed the intent to perform a criminal act therein at the time entry was granted." *Id.* at 254, 623 N.E.2d at 1364.

[10] Additionally, there were inconsistencies between the potential eyewitnesses' testimony and that of the defendant. *Id.* at 1014, n.4.

cases. That the appellate court had greater insight than normal into the verdict is neither here nor there with respect to its assessment of the record. And although trial counsel's testimony as to why he did not call the two witnesses may have been useful, nothing prevented Meskauskas from asking counsel for a declaration that could have been submitted to the state court if he believed it would have been favorable to him.

In any event, these distinctions make no difference on federal habeas review. Meskauskas does not contend that the Illinois Appellate Court misapplied Supreme Court law, so his argument falls under the question whether the court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2). Meskauskas is convinced that, had the court been presented with testimony corroborating his own testimony that he did not have the gun in hand when he entered the apartment and that Radovick (who had killed in the past) did approach him in a threatening manner, there is a reasonable probability that the outcome would have been different. The Illinois Appellate Court addressed all of this evidence and concluded that, even if it had been presented, there was not a reasonable probability that the outcome would have been different. This court has no basis in the record to conclude that the Illinois court made an unreasonable determination of the facts in light of the evidence in the case.

Considering Bauer's and Kall's testimony in light of Meskauskas's defense and the State's case against him, the trial court would have likely given their testimony little weight, particularly since it found Meskauskas incredible in regard to his claim that Radovick threatened him with a knife. It is most unlikely that Bauer's and Kall's testimony, as friends of Meskauskas who had given inconsistent statements to the police, would have convinced the trial court that Meskauskas acted in fear of his life, such that a second-degree conviction was warranted or that

Meskauskas entered the apartment without unlawful intent, exonerating him from home invasion.[11] The trial judge made express credibility findings as to each witness, as he was entitled to do, and concluded, based on all of the evidence, that defendant was guilty of the two crimes. Thus, Meskauskas has filed to show prejudice resulting from the failure to call Bauer and Kall to testify.[12] Accordingly, the Illinois Appellate Court's application of the *Strickland* prejudice prong to the facts of Meskauskas's case was not objectively unreasonable.

## II.   *Brady* Violation

Meskauskas also contends that the State committed a *Brady*[13] violation where it knew of Bauer's statement to the Assistant State's Attorney before trial and failed to disclose it as

---

[11] Even if Bauer had testified that he opened the door for Meskauskas, Meskauskas's entry would still have been an unauthorized entry where the evidence before the court was sufficient to establish that he entered with the intent to commit a criminal act. *See Bush*, 623 N.E.2d at 1364.

[12] The Seventh Circuit has recently resolved a case with the same issue, albeit different facts warranting a different outcome. In *Toliver* v. *McCaughtry*, 539 F.3d 766, 778 (7th Cir. 2008), the Seventh Circuit found prejudice resulted from counsel's failure to call two witnesses whose testimony would have significantly increased the probability of a different trial result. *Toliver* is distinguishable for the following reasons: (1) In *Toliver* the State's evidence regarding the defendant's intent was weak, *id.* at 778, whereas here, the State provided four witnesses providing strong testimony supporting all the elements of first-degree murder, *Meskauskas*, 2014 WL 2727220, at *49. (2) In *Toliver* the potential testimony would have provided unique information, available from no other witness, material to refuting intent, *Toliver*, 539 F.3d at 775, whereas here, Bauer's and Kall's affidavits did not contradict the State's witnesses regarding Meskauskas's intent to kill Radovick, *Meskauskas*, 2014 WL 2727220, at *49. (3) In *Toliver* the court ignored highly probative portions of the potential witnesses' affidavits that were inconsistent with the trial witnesses' testimony, *Toliver*, 539 F.3d at 778, whereas here, neither affidavit contained highly probative information regarding Meskauskas's lack of intent or self-defense theory, *Meskauskas*, 2014 WL 2727220, at *49–50. (4) In *Toliver* the court failed to consider the potential testimony in light of the defense's theory and the State's case against the defendant, *Toliver*, 539 F.3d at 778, whereas here, the appellate court, after conducting a thorough review of the existing evidence and the information provided by the affidavits, concluded Bauer's and Kall's testimony would not have altered the trial result in light of the defendant's theory, *Meskauskas*, 2014 WL 2727220, at *49. (5) In *Toliver* there was no concern that the witnesses' credibility would be impeached, whereas here there was no doubt that Bauer and Kall would be impeached not only based on bias in favor of Meskauskas but on prior inconsistent statements to the police.

[13] *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) held that the right to due process and fair trial requires that the prosecutor turn over to the defense all potentially exculpatory evidence.

12

potentially exculpatory testimony.[14] (Dkt. 1 at 44.) Meskauskas asserts that Bauer's exculpatory statement was material to the issue of his guilt because it would have shown (1) Meskauskas left the party willingly but was assaulted by Radovick before leaving (*id.* at 6B); (2) Meskauskas did not kick the door open, but rather the door was opened for him (*id.*); (3) instead of returning for revenge, Meskauskas returned to the party because he feared for Booth's safety as evidenced by his inquiring about Booth at the door (*id.* at 6C); (4) Radovick attempted to assault Meskauskas with a knife and shouted a gang slur (*id.*); and (5) Meskauskas brandished the gun in response to Radovick's hostile actions (*id.*). The government responds that it did not violate *Brady* where (1) there is no evidence besides bare allegations that exculpatory evidence was withheld and (2) even if the government did not disclose Bauer's statement, such statement (a) was not suppressed within the meaning of *Brady* and (b) did not result in prejudice. (Dkt. 9 at 28.)

"To establish a *Brady* violation, [a defendant] must show three elements: '(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice.'" *Harris* v. *Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007) (citing *United States* v. *O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)). To establish prejudice from the suppression of exculpatory evidence, there must be "a reasonable probability that the suppressed evidence would have produced a different verdict." *O'Hara*, 301 F.3d at 569.

Bauer's statement to the ASA was not exculpatory. Even if Meskauskas did not "bust" in the door or have a gun in his hand when he entered the apartment, the court took these alternative

---

[14] Bauer's affidavit attested that he told the Assistant State's Attorney that he lied to the police and then told the ASA the "true" story about what actually happened the night of the shooting. (Dkt. 10-16 at 177–78.) The affidavit provides a description of the "true" story as told to the ASA. (Dkt. 10-16.) The affidavit itself is not *Brady* material because it is a post-trial statement. The court considers whether the attested pre-trial statement is *Brady* material.

13

facts into account in its opinion. (*See* dkt. 10-1 ¶ 50.)[15] And for the reasons explained above, the allegedly suppressed evidence did not result in any prejudice to Meskauskas. Bauer had been identified as a witness and was available to the defense. The allegedly suppressed evidence would not have controverted testimony that Meskauskas returned to the party with a loaded gun; that he banged and/or kicked the door to gain entry; or that Meskauskas chased and repeatedly shot at Radovick from behind. Put differently, Bauer's affidavit does not undermine confidence in the guilty verdict for first-degree murder and home invasion. Accordingly, in the absence of exculpatory evidence and prejudice, the petition for a writ of habeas corpus based on a *Brady* violation must be denied.

### III. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(B), Meskauskas may appeal from this final order denying relief under § 2254 only if this court issues a certificate of appealability. A certificate of appealability may issue if the applicant has made a substantial showing of denial of a constitutional right. *Id.* § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

---

[15] The court explained,

> Although defendant expressed that he was afraid for the safety of Booth and his children, he did not call the police, but instead armed himself with a loaded gun and returned to the apartment, from where he was forcibly made to leave earlier. Additionally, more than one witness at trial testified that the victim obtained a knife as defendant was at the door, and Booth testified that the victim walked towards the door with the knife. Thus, the court was presented with this evidence. And by all accounts, the undisputed evidence indicated that defendant shot at the victim and Senodenos as they attempted to run away from him, defendant pursued them, and he shot the victim three times from behind. Defendant continued to pursue them and shoot at them, and chased them outside and around the apartment building. Defendant also threatened Senodenos after the victim went inside. Despite his claim of fearing for his life, defendant had sufficient criminal intent to demand, immediately after the shooting, that Senodenos tell the police that he saw nothing, while pointing the gun at his face.

(Dkt. 10-1 ¶ 50.)

constitutional claims debatable or wrong." *Slack* v. *McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). For the reasons stated above, the court finds that Meskauskas has not made a showing of a substantial constitutional question for appeal, as reasonable jurists would not find this court's ruling debatable. *See Lavin* v. *Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) ("To receive certification under § 2253(c), the prisoner must show that reasonable jurists would find the district court's assessment of the constitutional claim and any antecedent procedural rulings debatable or wrong." (citing *Slack*, 529 U.S. at 484–85 and *Davis* v. *Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003))). Accordingly, the court declines to issue a certificate of appealability.

## CONCLUSION AND ORDER

For the foregoing reasons, Meskauskas's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. The court declines to certify any issues for appeal.

Date: July 28, 2016

_____
U.S. District Judge Joan H. Lefkow